(154 P.3d 1176)

No. 94,159

STATE OF KANSAS, *Appellee*, v. SHANE LEE STOUT, *Appellant*.

Opinion filed on April 6, 2007.

*Ryan Eddinger* and *Jay Witt*, of Kansas Appellate Defender Office, for the appellee.

*James R. Spring*, deputy county attorney, and *Phill Kline*, attorney general, for the appellant.

Before MARQUARDT, P.J., PIERRON, J., and KNUDSON, S.J.

PIERRON, J.: Shane Lee Stout appeals his conviction by a jury of involuntary manslaughter and aggravated burglary. He challenges the sufficiency of the evidence supporting his convictions and contends that his criminal history must be proved to a jury beyond a reasonable doubt. We affirm.

Nick Maruska provided the testimony implicating Stout in this case. On October 2, 2002, Maruska got a 12 pack of beer and headed to Stout's house in the middle of the afternoon. Over the next several hours, Stout and Maruska drank the 12 pack of beer, were well into an additional case of beer, and smoked marijuana. During their conversation, Stout told Maruska that he had a problem with someone. Maruska replied that he would beat someone up if needed.

Stout and Maruska left the residence afoot on their way to a birthday party for Stout's brother. They continued to discuss the possibility of a physical confrontation. Maruska told Stout he would back him up if needed. Stout allegedly said he would compensate Maruska with marijuana for his assistance. Stout also told Maruska if something went wrong at the confrontation, they should say they were looking for a job.

Stout and Maruska arrived at John Adams' house. Adams was a foreman for a oil drilling company and had been Stout's supervisor. Stout had worked for the oil company for about 6 months before being laid off for missing 3 days of work. Stout's mother, Theresa Stout, testified that Stout and Adams had a prior confrontation over Stout's dog barking too much and that a fight had ensued.

Earl Adams, Adams' brother, lived in the apartment below Adams. Earl testified that on the night in question, Stout and Maruska knocked on his door and asked if Adams was home. Stout said he wanted to talk to Adams about their previous fight and wanted to get things all straightened out between them. Earl told the two that Adams was not home because Earl wanted to avoid any confrontation. Maruska testified he and Stout went upstairs to Adams' apartment anyway. Stout knocked on the door. Adams and Stout cussed at each other through the door. Adams told Stout to "go

the fuck away." Stout told Maruska to "go ahead" and "do what you're going to do." Maruska kicked in the door. Maruska and Stout went into the apartment.

Inside the apartment, Maruska and Adams got into a fight and exchanged punches. Maruska testified that Adams pulled a 12-inch bowie knife and began swinging it at him. Maruska pulled out a pocketknife he carried at his side, and the two engaged in a knife fight during which they stabbed each other. Maruska charged Adams and was able to push him into a window, breaking the window.

When Maruska turned around to leave, Adams pulled out a double-barreled 12 gauge shotgun. Maruska rushed Adams again and wrestled him to the ground. Maruska testified that he was on top of Adams as they wrestled for the shotgun and Stout was standing on the couch kicking Adams and sometimes kicking Maruska.

Maruska testified that he heard the shotgun go off. He was not sure whether he was hit by that shot, but they continued to wrestle over the gun. Maruska heard a second shot. Maruska tried to get up to leave, but he realized he had been shot in the left leg. He said he tried to crawl out of the apartment and yell for help. The next thing Maruska remembered was the presence of a paramedic and the police. Maruska was hospitalized and had surgery on his leg.

Earl Adams testified he heard noises coming from upstairs that sounded like someone moving a table across the floor, but that he did not think anything of it. A short time later he heard someone running and then his brother yelling to call 911. He got out of bed and walked around the front porch to where Adams' door lead upstairs. Adams was sitting in a chair with his arm half blown off. Earl called 911 and told dispatch they needed two ambulances because Adams said there was a kid upstairs that would need help as well. Adams told the paramedics that he had shot himself in the arm.

Stout ran back to his house. Theresa testified that Stout was soaked from rain and had blood all over the front of his shirt. She had Stout take off his clothes and she put them in the clothes washer. Detectives later came to Stout's house and he was taken to the police station for questioning.

Stout told Detective Kurt Weber that after he and Maruska had knocked on Adams' door, he started to leave because Adams was not home. When he was halfway down the stairs, he heard a commotion in Adams' apartment and realized Adams and Maruska were fighting. While on the stairs, Stout said he heard two shots. He then he ran into the apartment, which explained why his hat was found in Adams' apartment. Stout tried to pick up Maruska and carry him out. Maruska had been shot in the leg, and Stout was unable to move him. Stout told Detective Weber that he did not touch Adams in any way and that Maruska was lying as to Stout's involvement in the fight. Stout also confirmed that he had a previous fight with Adams over Stout's dog.

Adams was admitted to the hospital on October 2, 2002, but he later died on October 26, 2002. Adams' left arm had to be amputated, he had major organ failure due to extreme loss of blood, and he developed a blood infection. The coroner concluded: "Complications of shotgun wound to the right arm was the cause of death, with hepatocellular carcinoma, hepatic cirrhosis associated the hepatitis B, and hypertensive cardiovascular disease were contributory conditions."

Stout was charged with first-degree murder, aggravated burglary, and conspiracy to commit aggravated burglary. The same charges were filed against Maruska, but Maruska accepted a plea to a reduced charge of aggravated battery in exchange for his testimony against Stout. At the end of the State's case, Stout was successful in obtaining a directed verdict and dismissal of the charge of conspiracy to commit aggravated burglary. The trial court found the extent of any agreement between Stout and Maruska was for nothing more than having Maruska beat up Adams. The jury convicted Stout of aggravated burglary and a lesser included charge of involuntary manslaughter. The trial court sentenced Stout to a presumptive sentence of 49 months' incarceration for involuntary manslaughter and a consecutive presumptive sentence of 32 months' incarceration for aggravated burglary. Stout appeals.

Stout raises several arguments challenging the sufficiency of the evidence supporting his convictions.

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' [Citation omitted.]" *State v. Kesselring,* 279 Kan. 671, 679, 112 P.3d 175 (2005).

First, Stout argues the record does not contain substantial competent evidence that he personally committed either aggravated burglary or involuntary manslaughter. The support for his argument is based on the lack of evidence that he intended to commit a felony upon entry to Adams' apartment. Stout relies on the trial court's statement during instruction conference that "the only evidence there is, even if you take the State's evidence in the most positive light, is that defendant wanted him to beat him up. Not commit an aggravated battery, but simply a battery." He contends that a person who enters an apartment with the intent to commit an aggravated battery might be guilty of aggravated burglary, but a person who enters an apartment with an intent to commit a simple battery cannot be guilty of aggravated burglary.

Stout also contends the record lacks substantial competent evidence to support a conviction of involuntary manslaughter as there is a lack of evidence that Stout's actions directly caused Adams' death and that the death resulted from Adams' actions. Stout states the record indicates that he may have kicked Adams, possibly in an attempt to break up the fight, but there were no indications Adams was mortally wounded by any kick. Stout argues he did not take a knife or gun into the apartment, nor did he touch a gun or knife when he was inside.

The last sufficiency argument raised by Stout is that the record does not contain sufficient evidence to support the legal conclusion that he was culpable as an aider or abettor. Stout argues his command to Maruska to "go ahead" or "do it" was inadequate to establish guilt as an aider or abettor. He also argues that even if he is liable for his comment to Maruska to "go ahead," the only crime he could be convicted of was simple battery.

K.S.A. 21-3205(1) provides: "A person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the

crime." K.S.A. 21-3205(2) is the foreseeability provision of the aider and abettor statute: "A person liable under subsection (1) hereof is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by such person as a probable consequence of committing or attempting to commit the crime intended."

Stout focuses on the "in pursuance of the intended crime" language in K.S.A. 21-3205(2) in arguing that once a simple battery occurred, his liability as an aider and abettor was legally terminated since it is impossible to be "in pursuance of" an objective that has already been completed. Stout also suggests that the language "in pursuance of" is ambiguous and therefore must be strictly construed in favor of the accused. See *State v. McCurry*, 279 Kan. 118, 121, 105 P.3d 1247 (2005) (" 'The general rule is that a criminal statute must be strictly construed in favor of the accused, which simply means that words are given their ordinary meaning. Any reasonable doubt about the meaning is decided in favor of anyone subjected to the criminal statute.' ") He argues "in pursuance of" should be limited to any criminal act committed prior to the intended crime that promotes accomplishment of the intended crime.

Viewing the evidence in the light most favorable to the State, there is sufficient evidence that Stout not only aided and abetted in an aggravated burglary, but there is evidence that he actually participated in the aggravated burglary as well. Maruska testified that Stout participated in the incident by kicking Adams during the wrestling over the shotgun. See *State v. Green*, 280 Kan. 758, 761, 127 P.3d 241 (2006)("To establish guilt on the basis of aiding and abetting, the State was required to show that Green knowingly associated with the unlawful venture and participated in such a way as to indicate that he was facilitating the success of the venture.").

Not surprisingly, Stout downplays any emphasis on the fact that he ordered Maruska to knock down the door to Adams' apartment in order to facilitate the battery against Adams, but we find this fact to be the critical factor that started an uninterrupted string of events leading to the severe injury to Adams and his eventual death. Stout is guilty of facilitating the battery against Adams and is guilty

for the foreseeable acts committed by Maruska. Stout attempts to limit his guilt only to the acts leading up to any battery committed against Adams. Stout does not cite any case law—only general definitions—concerning the language in K.S.A. 21-3205(2) ("in pursuance of the intended crime"). We find Stout's interpretation is not consistent with the foreseeability provisions of the criminal code. Stout is culpable for his orders to Maruska to beat up Adams and any reasonably foreseeable consequences of this order to commit violence. Stout's culpability does not cease upon completion of the battery against Adams but extends to all reasonably foreseeable crimes committed within that incident. K.S.A. 21-3205(2).

Aggravated burglary, the underlying crime in the instant case, is an inherently dangerous felony under K.S.A. 21-3436. We disagree with Stout's argument that someone entering an apartment with an intent to commit a simple battery cannot be guilty of aggravated burglary. As pointed out by the State, a key fact in this case is the forcible entry into Adams' residence with the intent to commit a battery. This was not a chance meeting on the street or even an encounter in a club. This was a planned violent act. Stout ordered Maruska to expend significant force against someone's dwelling by kicking in the front door in order to complete a crime of violence inside. It was foreseeable that an aggravated battery might take place, and thus an aggravated burglary occurred. The State cites *State v. Foy*, 224 Kan. 558, 566-67, 582 P.2d 281 (1978), where the court stated:

"While our court has never examined this issue, several states confronted with the question have held that burglary based upon the crime of assault can properly serve as the predicate for a felony-murder conviction. (*Blango v. United States*, 373 A.2d 885 [D. C. 1977]; *State v. Miller*, 110 Ariz. 489, 520 P.2d 1113 [1974]; *People v. Miller*, 32 N.Y.2d 157, 344 N.Y.S.2d 342, 297 N.E.2d 85 [1973]; and *State v. Tremblay*, 4 Or. App. 512, 479 P.2d 507 [1971]. See also Comment, *The Merger Doctrine As A Limitation On The Felony-Murder Rule: A Balance Of Criminal Law Principles*, 13 Wake Forest L. Rev. 369, 388-94 [1977].).

"We find the reasoning in *People v. Miller*, supra, persuasive. The court states:
'. . . [P]ersons within domiciles are in greater peril from those entering the domicile with criminal intent, than persons on the street who are being subjected to the same criminal intent. Thus, the burglary statutes prescribe greater punishment for a criminal act committed within the domicile than for the same act

committed on the street. Where, as here, the criminal act underlying the burglary is an assault with a dangerous weapon, the likelihood that the assault will culminate in a homicide is significantly increased by the situs of the assault. When the assault takes place within the domicile, the victim may be more likely to resist the assault; the victim is also less likely to be able to avoid the consequences of the assault, since his paths of retreat and escape may be barred or severely restricted by furniture, walls and other obstructions incidental to buildings. Further, it is also more likely that when the assault occurs in the victim's domicile, there will be present family or close friends who will come to the victim's aid and be killed. . . .' ([32 N.Y.2d at] 160-161)."

The next sufficiency question raised by Stout is that his conviction for involuntary manslaughter must be reversed because Adams killed himself. Stout in essence argues he cannot be convicted of felony murder when the killing in this case resulted from a lawful act by Adams. Stout cites Black's Law Dictionary, 602 (6th ed. 1991) and the Model Penal Code § 210.1 (2001) in defining "homicide" as an act of the perpetrator causing the death of another human being, and he argues that it is undisputed in this case that Adams' shot and killed himself.

Felony murder is the killing a human being committed in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto. K.S.A. 21-3401(b).

Stout cites cases in support of his argument. In *State v. Sophophone*, 270 Kan. 703, 19 P.3d 70 (2001), a co-felon was shot and killed by a police officer as he fled the scene of an aggravated battery. The Kansas Supreme Court reversed Sophophone's conviction of felony murder of the co-felon as follows:

"A felon may not be convicted of felony murder pursuant to K.S.A. 21-3401(b) for the killing of his co-felon, caused not by his actions but by the lawful acts of a law enforcement office acting in self-defense in the course and scope of his duties in apprehending the co-felon, who was fleeing from an aggravated burglary in which both felons had participated." 270 Kan. 703, Syl. ¶ 6.

In *State v. Murphy*, 270 Kan. 804, 19 P.3d 80 (2001), the court applied the same agency principles in *Sophophone* on a question reserved where the co-felon was killed by a victim:

"Under the facts of this case and for the reasons set forth in *State v. Sophophone*, 270 Kan. 703, 19 P.3d 70 (2001), a felon may not be convicted of felony

murder pursuant to K.S.A. 21-3401(b) for the killing of his co-felon caused not by his acts or actions but by the lawful acts of a victim of aggravated robbery and kidnapping acting in self-defense for the protection of his residence and the occupants thereof." 270 Kan. 804, Syl. ¶ 2.

The court in *State v. Bryant*, 276 Kan. 485, 78 P.3d 462 (2003), upheld a felony-murder conviction of the defendant where a co-felon was shot by third party in the house where the co-felons had planned on robbing the victim of his drugs and money. The *Bryant* court distinguished *Sophophone* and *Murphy* by holding that Bryant's co-felon "was not killed by a law enforcement officer or by the lawful acts of a victim acting in self-defense for the protection of his residence and the occupants thereof." 276 Kan. at 490. The *Bryant* court appears to hold that in a drug deal "gone wrong," the felony-murder doctrine applies because of the threat or use of physical force or violence inherent in drug activity and that both the buyers and sellers carried and used firearms. 276 Kan. at 491.

In the present case, we have a *Murphy*-type situation where the victim of an aggravated burglary lawfully acts in self-defense for the protection of his residence and the occupants thereof. However, the lawful actions of the victim did not result in the death of a co-felon but caused self-inflicted wounds that ultimately resulted in the victim's death. The critical distinction in this case is that an innocent victim was killed, not a co-felon. Adams' attempts at protecting himself and protecting his residence from the attack of Maruska and Stout were the cause of the self-inflicted gun shot wound that ultimately caused his death.

The factual scenario in the present case lends itself to the question of whether charges of felony murder would apply if Adams' shots had not hit himself or Maruska, but had fatally wounded an innocent bystander. In *People v. Lowery*, 178 Ill. 2d 462, 467, 687 N.E.2d 973 (1997), the court held that the felony murder doctrine applied even though the intended victim of the underlying felony fired the shot that killed a bystander. They further held that the robbery victim's actions were not an intervening cause or were merely coincidental where the victim's resistance was a direct response to the defendant's criminal acts and that resistance did not break the causal chain.

We find no need to apply any intervening or superseding causes in a case where the shooting occurs as the victim and a co-felon are involved in a dangerous wrestling match over a gun. In this situation it really does not matter whether the victim is shot by himself or herself or by the co-felon. The entire incident in this case, from Maruska's breaking down Adams' door to the wrestling where each participant is shot, was a continuous felonious event without any break in the chain of causation. See *State v. Anderson*, 270 Kan. 68, 74-77, 12 P.3d 883 (2000) (citing *People v. Schmies*, 44 Cal. App. 4th 38, 51 Cal. Rptr. 2d 185 [1996], and holding that a driver in a high speed chase could be tried for involuntary manslaughter for the death of occupants killed by the police officer running a controlled intersection).

Where a victim is attacked and in trying to reasonably defend himself or herself inflicts on himself or herself a fatal wound, the felony-murder doctrine may be applied.

Stout also argues his conviction for involuntary manslaughter must be reversed because there is insufficient evidence explaining Adams' death. He claims the coroner's report and death certificate classifying Adams' death as a "homicide" was based on the coroner's belief that Adams had been shot by another individual. He also argues the coroner's opinion that "[c]omplications of shotgun wound to the right arm was [Adams'] cause of death" should be disregarded because the coroner never saw the shotgun wound since Adams' arm had been amputated prior to Adams' death and the resulting autopsy. Stout argues there is no evidence to explain the 3½-week intervening period between the time when Adams was shot and his ultimate death. Stout argues the intervening acts in the 3½-week time period superseded any proximate cause linking Stout to the death.

Stout does not cite any cases in support of his argument, only general case law on proximate cause. See *State v. Gholston*, 272 Kan. 601, Syl. ¶ 1, 35 P.3d 868 (2001), *cert. denied* 536 U.S. 963 (2002) ("Where a person inflicts upon another a wound which is calculated to endanger or destroy life, it is not a defense to a charge of homicide that the alleged victim's death was contributed to or

caused by the negligence of the attending physicians or surgeons.").

The testimony of Dr. Jamie Oeberst, the coroner, supplied sufficient evidence of Adams' cause of death. Dr. Oeberst's conclusion was: "Complications of shotgun wound to the right arm was the cause of death, with hepatocellular carcinoma, hepatic cirrhosis associated the hepatitis B, and hypertensive cardiovascular disease were contributory conditions." Dr. Oeberst testified how the complications from the shotgun wound caused Adams' death. Adams lost a lot of blood from the shotgun wound. The loss of blood caused his kidneys to stop working. The loss of blood and the resulting low blood pressure caused a small stroke in his brain. About 12 days into Adams' hospital stay, he developed a blood infection (sepsis) which in turn caused his liver to fail. Dr. Oeberst testified that the shotgun wound and the resulting loss of blood caused Adams to develop more complications to the diseases that were already present.

We find Stout's convictions are supported by sufficient evidence such that a rational factfinder could have found him guilty beyond a reasonable doubt.

Finally, Stout argues the sentencing court violated the principles in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), when it used his prior convictions to increase his sentence beyond the otherwise prescribed maximum without submitting the convictions to a jury for proof beyond a reasonable doubt. He recognizes the Kansas Supreme Court rejected this argument in *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002), but argues *Ivory* was wrongly decided.

Stout's constitutional attack on the trial court's application of his criminal history is a question of law allowing an unlimited review. See 273 Kan. at 46. The *Ivory* court analyzed the prior conviction exception to the *Apprendi* rule and relied upon language from *Apprendi* indicating that proof of prior convictions as sentencing enhancements need not be submitted to a jury and proved beyond a reasonable doubt. 273 Kan. at 46. The court held that *Apprendi* did not require a jury finding of the fact of a prior conviction beyond a reasonable doubt in order for the prior conviction to be

included in a defendant's criminal history score under the Kansas Sentencing Guidelines Act, K.S.A. 21-4701 *et seq.* The court also rejected the argument that *Almendarez-Torres v. United States*, 523 U.S. 224, 140 L. Ed. 2d 350, 118 S. Ct. 1219 (1998), the source of the prior conviction exception, had been called into doubt by *Apprendi. Ivory*, 273 Kan. at 46-47.

Stout acknowledges that *Ivory* controls. This court is duty bound to follow Kansas Supreme Court precedent unless there is some indication the court is departing from its previous position. *State v. Jackson*, 30 Kan. App. 2d 288, 299, 41 P.3d 871 (2002). Stout proffers no such indication, and his argument fails. See *State v. Lackey*, 280 Kan. 190, 235-40, 120 P.3d 332 (2005), *cert. denied* 164 L. Ed. 2d 399 (2006) (reaffirming *Ivory* after the United States Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 160 L. Ed. 2d 621, 125 S. Ct. 738 [2005], and *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 [2004]).

Affirmed.