No. 99,281

STATE OF KANSAS, *Appellee*, v. KENDRALL RANSOM, *Appellant*.

(207 P.3d 208)

698

Opinion filed May 15, 2009.

*Carl F.A. Maughan*, of Maughan & Maughan LC, of Wichita, argued the cause and was on the brief for appellant.

*Boyd K. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Stephen N. Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: A jury convicted Kendrall Ransom of two counts of felony murder and two counts of attempted aggravated robbery. On this direct appeal Ransom argues: (1) The district judge erred by denying his motion to suppress his confession; (2) certain testimony violated his confrontation rights under the Sixth Amendment to the United States Constitution and was inadmissible hearsay; (3) he should have received a proximate cause felony-murder jury instruction; (4) he was entitled to a mistrial after a State witness violated a limine order; (5) the State should not have been permitted to amend its information; and (6) the evidence of the felony murder of Christopher Spain Bey was insufficient.

### Factual and Procedural Background

On the evening of March 20, 2006, Ransom; Christopher Gant; Jeremy Miles; and Ransom's cousin, Karlan, met at Sharondi Washington's home in Wichita, planning to rob a drug house. Armed with guns previously stored in Washington's living room closet, Gant drove the men in his gray Ford Contour to a drug house on North Kansas. The group's plans changed, however, when they observed Donta McDonald walk out of the house toward a truck. The men decided that Gant should run up and rob McDonald. Gant approached McDonald, but Ransom, believing that Gant was moving too slow, ran and confronted McDonald with a shotgun, demanding money.

Ignoring Ransom's demands, McDonald stepped into the truck and attempted to scoot across the bench seat. When one of the men screamed that McDonald was trying to get to the passenger door and shoot him, Ransom shot McDonald, who later died. Ransom and the others then ran back to Gant's car, having obtained no money or drugs. Gant drove to Washington's home, where he left Ransom, Miles, and Karlan.

Undeterred, Ransom, Miles, and Karlan then fixed a flat tire on Washington's mother's car and drove to a drug house on North Lorraine. The men approached the house, stating they were there to buy drugs. An individual opened the door but then fell to the

ground and slammed the door after seeing Ransom holding a shotgun.

There is some dispute over exactly what happened next. The State's version is that Cordell Redd, Antonio Galbraith, Terral Straughter, and Spain Bey were in the house on North Lorraine when Ransom, Miles, and Karlan approached it. Redd answered the door, saw a long gun, slammed the door, and ran through the house and out the back door. Straughter saw Redd slam the door, heard Redd yell "thumper," and left the house through a window. Galbraith locked himself in a bathroom and then heard gunshots. Spain Bey was in a bedroom throughout these events. Ransom's version is that he pushed open the door of the house, saw men coming toward him with pistols, and ran. Ransom also told investigating officers that he heard a window break and gunshots fired from within the residence as he, Miles, and Karlan fled. There is no dispute that officers found Spain Bey dead after the attempted aggravated robbery.

There also is no dispute that Ransom, Miles, and Karlan ran through the neighborhood, again without having obtained any money or drugs, and called a friend for a ride to Washington's home. When they arrived, Washington was watching the 10 p.m. news, which reported that officers were looking for a green Ford Taurus involved in the two shootings that evening. Ransom would later confess that he, Miles, and Karlan laughed and "high-fived" each other after the news report because they believed officers had an inaccurate lead about the car.

Two days later, an anonymous female called the Wichita Police Department with information about the homicides. This information led detectives to Washington's home, where Washington consented to a search. Detectives found two handguns and a shotgun. Washington also informed the detectives that Ransom, Gant, Miles, and Karlan participated in the homicides. Pick-up orders were issued for the men, and officers found Ransom rolled up in a blanket on the floor of a friend's home. He was transported to the police station at 3:54 a.m.

At the station, two detectives began interviewing Ransom at 5:23 a.m. Ransom was handcuffed when the detectives entered the in-

terrogation room. After completion of a personal history sheet, the officers read Ransom his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966). He confirmed that he was not under the influence of alcohol, drugs, or prescription medication and that he did not suffer from any impairment as a result of a head injury. Ransom then signed a waiver form stating that he understood his rights. One of the detectives printed Ransom's name under Ransom's signature because it was hard to read.

A tape recorder was then activated. The first portion of Ransom's interview ended at 6:43 a.m. The detectives took a 25-minute break and then interviewed Ransom from 7:08 a.m. to 7:33 a.m. The detectives then took a 45-minute break and returned to interview Ransom from 8:18 a.m. to 8:31 a.m. Ransom confessed as described above, and he was charged with two counts of first-degree felony murder and two counts of attempted aggravated robbery. Count 3 of the information filed June 7, 2006, stated:

"[A]nd on or about the 20th day of March, 2006, A.D., in the County of Sedgwick, State of Kansas, one JEREMY T. MILES, KENDRALL * RANSOM and KARLAN D. RANSOM did then and there unlawfully, kill a human being, to-wit: Christopher L. Spain Bey, while in the commission of or the attempt to commit an inherently dangerous felony, to-wit: Aggravated Robbery, as defined in K.S.A. 21-3427, inflicting gunshot injuries from which the said Christopher L. Spain Bey did die on the 20th day of March, 2006[.]"

Before trial, Ransom argued that his statements to law enforcement were not admissible. At his *Jackson v. Denno* hearing, see 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964), Ransom testified that at 10 p.m. on the night before he was arrested, he had drunk a pint of Hennessy and had taken two Ecstasy pills. Ransom asserted that Ecstasy makes him delusional and usually lasts 12 hours. Ransom also claimed that, although he remembered being handcuffed and shackled, he did not remember signing the waiver of his *Miranda* rights or the 3 hours of interviews by the detectives. Ransom also asserted that the signature on the waiver form did not look like his.

One of the interviewing detectives also testified at the hearing, explaining that he did not coerce Ransom into confessing, that he

did not threaten Ransom, that he did not deprive Ransom of food or water, and that he did not detect the smell of alcohol or marijuana on Ransom. The detective further stated that Ransom never fell asleep and never asked for an attorney or requested to stop the interview. Neither detective re-*Mirandized* Ransom after the interview breaks.

The district judge questioned Ransom's credibility and determined that the interrogation involved one interview, not three, and that detectives did not need to re-*Mirandize* Ransom after the breaks. The district judge also ruled that Ransom's statements were knowingly and voluntarily made and thus admissible at trial.

Ransom also filed a pretrial motion in limine to prevent introduction of evidence about his involvement with gangs, on the grounds that such evidence was immaterial, irrelevant, and inadmissible. The State agreed that it would not offer any evidence of Ransom's gang affiliation, and the district judge sustained the motion. At trial, however, the lead detective on the North Lorraine homicide, Heather Bachman, referenced gangs in the following series of direct examination questions and answers:

"Q: [Prosecutor] Besides just doing the pick-up, did you make additional efforts to try to find those four men?

"A: [Bachman] Yes.

"Q: And what were they?

"A: The gang officers — —

"[Defense counsel]: Objection, Your Honor."

As a result of this testimony, Ransom moved for mistrial. The district judge overruled the motion, stating that the State did not design its question to elicit a response about gangs. The district judge also instructed the jury "to ignore the . . . answer that was given by [Bachman] stating that the gang unit was one of the units that was asked to investigate. Neither the State nor the witness is suggesting, insinuating or alleging that the defendant is affiliated with a gang."

Gary L. Miller, chief criminalistics and firearm toolmark examiner for the Sedgwick County Regional Forensic Science Center, testified that only State's Exhibit 7 F, a shotgun recovered from Washington's home, could have fired the 12-gauge shotgun shell

found next to McDonald. Miller also testified that none of the firearms recovered from Washington's home could have been used to kill Spain Bey.

Washington testified and identified State's Exhibit 7 F as the shotgun Ransom took with him the evening of the crimes. Washington also corroborated Ransom's confession about the men's reaction to the news report about the green car, testifying that one of the men stated, "[T]hey [have] the wrong lead." Washington further testified that, during the news, one of the men said, "[H]e must have shot his homie." But she could not confirm that this statement concerned the North Lorraine homicide. Washington also said that Ransom had stated he shot "them" to get money, and one of the men had said Gant failed to run up to McDonald as planned.

At the close of the evidence, the State moved to amend Count 3 of the information to state:

"[A]nd on or about the 20th day of March, 2006, A.D., in the County of Sedgwick, State of Kansas, one KENDRALL * RANSOM did then and there unlawfully, kill a human being, to-wit: Christopher L. Spain Bey, while in the commission of or the attempt to commit *or flight from an attempt to commit* an inherently dangerous felony, to wit: Aggravated Robbery, as defined in K.S.A. 21-3427 by inflicting gunshot injuries from which the said Christopher L. Spain Bey did die on the 20th day of March, 2006." (Emphasis added.)

The district judge permitted the amendment, stating:

"[A]s a matter of law the State can and has the legal ability to amend the complaint/information at the stage we're at now. In addition, the amendment is part of the same statute. . . . [I]t's part of the same subsection to the statute. And so it is not a separate and distinct charge. It is essentially the same charge.

"In addition, the Court finds that it is . . . not a surprise given the facts that all parties knew at the time the complaint/information was filed. . . .

"In addition, given the facts and circumstances of the case, given the evidence that I've heard, . . . the Court finds that the defendant would not be unduly prejudiced by an . . . amendment at this time."

Ransom requested a jury instruction on the rule of proximate cause in felony murders, which read:

"PROXIMATE CAUSE UNDER THE FELONY MURDER RULE

" 'Time, distance and the causal relationship between the underlying felony and the killing are factors to be considered in determining whether the killing is a part

of the felony.' [Citations omitted.] The reason for the felony murder doctrine is to relieve the State of the burden of proving premeditation where the victim's death is caused by the felon or an agent of the felon while engaged in a felony. For the Defendant to be found guilty of felony murder, the jury must find that the Defendant, or an agent of the Defendant in the commission of the felony of Attempted Aggravated Robbery, killed the victim. [Citations omitted.]"

The district judge refused the request on the ground that the instruction misstated the law. Instead, Ransom's jury received the following instruction based on PIK Crim. 3d 56.02, which read:

"In Count 3, the defendant is charged with the crime of murder in the first degree. The defendant pleads not guilty.
"To establish this charge, each of the following claims must be proved:
"1. That the defendant or another killed Christopher Spain Bey;
"2. That such killing was done while attempting to commit aggravated robbery or in flight from attempting to commit aggravated robbery; and
"3. That this act occurred on or about the 20th day of March, 2006, in Sedgwick County, Kansas."

### Motion to Suppress

Regarding his motion to suppress, Ransom first argues that his confession was not the product of his free and independent will because he was an 18-year-old high school student high on Ecstasy, who had consumed a large amount of alcohol, and the police chained him to the floor and a desk in a small interrogation room, where he had no outside contact for 2 hours and 10 minutes.

The State argues there was substantial competent evidence to support the district judge's factual findings and the ruling that the confession was voluntary.

Our standard of review is well settled:

"When reviewing a district court ruling on a motion to suppress a confession, an appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard. The ultimate legal conclusion drawn from those facts is reviewed de novo. The appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence." *State v. Gant*, 288 Kan. 76, Syl. ¶ 1, 201 P.3d 673 (2009).

Faced with a motion to suppress, the prosecution bears the burden of proving by a preponderance of the evidence that a confession was voluntary. The essential inquiry is whether the statement was the product of the defendant's free and independent will. The

court looks at the totality of the circumstances surrounding the confession and determines voluntariness by considering the following nonexclusive factors: "[T]he defendant's mental condition; the manner and duration of the interrogation; the ability of the defendant to communicate with the outside world; the defendant's age, intellect, and background; the fairness of the officers in conducting the interrogation; and the defendant's proficiency with the English language." *State v. Cofield*, 288 Kan. 367, Syl. ¶¶ 2, 3, 203 P.3d 1261 (2009).

Substantial competent evidence supports the district judge's factual findings in this case. First, there was no evidence other than Ransom's testimony, which the district court judge regarded as incredible, tending to show that Ransom was impaired by drugs or alcohol or both at the time he confessed. Indeed, Ransom denied being under the influence at the start of the interview. Second, the manner and duration of the interrogation was reasonable. Ransom's time in the interrogation room lasted only 3.5 hours with substantial breaks. There were no signs of physical or psychological coercion, other than the inherent fact of confinement and the use of temporary restraints. Compare *State v. Brown*, 285 Kan. 261, 271-78, 173 P.3d 612 (2007) (defendant's confession voluntary even though officers handcuffed defendant to table in small interrogation room for 12 hours). Third, nothing in the record establishes that Ransom's age, intellect, or background negatively affected his ability to interact with or answer or refuse to answer questions from the police. The record demonstrates Ransom understood the detectives' questions and answered them appropriately. The totality of these circumstances amply supports the district judge's legal conclusion that Ransom's confession was voluntary.

Ransom next argues that statements he made to officers during the second and third portions of his interview should have been suppressed because the detectives failed to re-*Mirandize* him. The State contends that re-*Mirandizing* Ransom was unnecessary.

The question of whether a suspect should be re-*Mirandized* after a waiver is one of law that this court answers by considering the totality of the circumstances. One factor this court considers is the

time between the waiver and the statements sought to be suppressed. *State v. Nguyen*, 281 Kan. 702, 723, 133 P.3d 1259 (2006).

Our court's decision in *State v. Mattox*, 280 Kan. 473, 124 P.3d 6 (2005), is instructive on this issue. In that case, at 4:30 p.m. on October 16, 2001, Lawrence officers read defendant Michael Mattox his *Miranda* rights. When Mattox immediately requested an attorney, officers placed him in jail and began the booking process. During booking, at 5:53 p.m., Mattox repeatedly interrupted a corrections officer, stating that he had something he needed to discuss. The corrections officer insisted Mattox wait for an investigating officer. At 7:30 p.m., after Mattox had been processed, Mattox again approached the corrections officer, stating that he had information on certain murders. The corrections officer took the information, and Mattox wrote a statement describing two homicides. Lawrence officers contacted the Topeka Police Department, because the homicides had been committed in Topeka. Detectives from the TPD arrived at the Lawrence jail at 12:55 a.m. and began questioning Mattox. The detectives did not re-*Mirandize* Mattox.

Analyzing federal and Kansas case law, our court concluded that Mattox's statements were voluntary:

"We begin our analysis by observing that one court has stated: '[T]here is no requirement that an accused be continually reminded of his rights once he has intelligently waived them. [Citation omitted.]' *United States v. Anthony*, 474 F.2d 770, 773 (5th Cir. 1973). The appellate courts of New York have refined the *Anthony* court's general statement by including a reasonable time factor: 'When a person in continuous police custody receives *Miranda* warnings and voluntarily waives his rights, it is not necessary to repeat the warnings before later questioning within a reasonable time thereafter. [Citations omitted.]' *People v. Gonzalez*, 5 App. Div. 3d 696, 697, 774 N.Y.S.2d 739 (2004) (11 hours after first questioning defendant was reasonable); [citation omitted].

"See also *United States v. Andaverde*, 64 F.3d 1305, 1313 (9th Cir. 1995) (1-day interval between waiver of *Miranda* rights and defendant's statement to law enforcement was not unreasonable); *Ballard v. Johnson*, 821 F.2d 568, 571-72 (11th Cir. 1987) (3- to 4-hour gap between waiver of *Miranda* rights and third conversation in another city was not unreasonable); *Evans v. Cotter*, 790 F.2d 1232 (5th Cir. 1986) (several-hours' gap between waiver of *Miranda* rights and confession not unreasonable); *Stumes v. Solem*, 752 F.2d 317, 320 (8th Cir. 1985)

(5-hour interval between waiver of *Miranda* rights and defendant's statement to law enforcement not unreasonable).

"On this issue of repeated *Miranda* warnings, this court has generally held: '[O]nce the mandate of *Miranda* is complied with at the threshold of the interrogation by law enforcement officers, the warnings need not be repeated at the beginning of each successive interview. To adopt an automatic second warning system would be to add a perfunctory ritual to police procedures rather than provide the meaningful set of procedural safeguards envisioned by *Miranda*. [Citations omitted.]' *State v. Boyle*, 207 Kan. 833, 841, 486 P.2d 849 (1971).

See *State v. Pyle*, 216 Kan. 423, Syl. ¶ 9, 532 P.2d 1309 (1975) ('Once a suspect is fully advised of his rights and fully understands them, it is not necessary to give repeated *Miranda* warnings each time he is interviewed.').

. . . .

". . . [Thus] under these circumstances, a second *Miranda* warning when Mattox arrived at the interview room was not required." *Mattox*, 280 Kan. at 487-88, 91.

Following *Mattox*'s holding and rationale, and under the totality of the circumstances of this case, we have no trouble concluding as a matter of law that it was unnecessary to re-*Mirandize* Ransom at the beginning of each portion of his interview. The first break of 25 minutes and the second break of 45 minutes did not put the later portions of the interview outside a reasonable time.

### Sixth Amendment Confrontation and Hearsay

Ransom argues that the district court erred by permitting Washington to testify about the reaction of Ransom, Miles, and Karlan on the night of the murders to the newscast about a green car, including the statement "[T]hey [have] the wrong lead." In his view, the admission of Washington's testimony violated his confrontation rights guaranteed by the Sixth Amendment to the United States Constitution and failed to meet the requirements of a statutory hearsay exception. Ransom does not challenge the admission of the statement "He must have shot his homie," which was also admitted through Washington's testimony.

The Sixth Amendment Confrontation Clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The question of whether confrontation rights have been violated is one of

law over which this court exercises de novo review. *State v. Hughes*, 286 Kan. 1010, 1014, 191 P.3d 268 (2008).

Ransom's first argument is that Washington's statement was not admissible because one or more of his codefendants made the statements and he could not confront the co-defendant or co-defendants at trial. This argument is based on *United States v. Bruton*, 391 U.S. 123, 137, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968), which held that a defendant's right to confront the witnesses is violated if a codefendant's confession is admitted into evidence in a joint trial. See *State v. Swafford*, 257 Kan. 1023, Syl. ¶ 4, 897 P.2d 1027 (1995), *modified* 257 Kan. 1099, Syl. ¶ 1, 973 P.2d 196 (1996).

Neither *Bruton* nor any Kansas case following it can help Ransom. *Bruton* and like cases apply only in situations in which a codefendant's confession is admitted during a joint trial and the codefendant does not testify. *Bruton*, 391 U.S. at 137; see *Swafford*, 257 Kan. 1099, Syl. ¶¶ 1-4. Ransom was the sole defendant in his trial.

Ransom's second argument focuses on *Crawford v. Washington*, 541 U.S. 36, 68, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), which held that testimonial hearsay may be admitted only if the declarant is unavailable and the defendant has had an earlier opportunity to cross-examine the declarant. To define "testimonial," Ransom relies upon *United States v. Summers*, 414 F.3d 1287 (10th Cir. 2005). In *Summers*, the Tenth Circuit Court of Appeals held that "a statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that his statement might be used in the investigation or prosecution of a crime." 414 F.3d at 1302.

Ransom is correct in his description of *Crawford*'s holding, 541 U.S. at 68, and in his assertion that courts have followed and further analyzed *Crawford*'s consideration of when statements are testimonial. See *Davis v. Washington*, 547 U.S. 813, 821-22, 165 L. Ed. 2d 224, 126 S. Ct. 2266 (2006); *State v. Davis*, 283 Kan. 569, 574-76, 158 P.3d 317 (2007). But this court has declined to follow the Tenth Circuit's decision in *Summers*, rejecting its formula in *Brown*, 285 Kan. at 293-94. Instead, we have established several

factors to be considered in determining when evidence is testimonial:

"(1) Would an objective witness reasonably believe such a statement would later be available for use in the prosecution of a crime?

"(2) Was the statement made to a law enforcement officer or to another government official?

"(3) Was proof of facts potentially relevant to a later prosecution of a crime the primary purpose of the interview when viewed from an objective totality of the circumstances, including circumstances of whether

(a) the declarant was speaking about events as they were actually happening, instead of describing past events;

(b) the statement was made while the declarant was in immediate danger, *i.e.*, during an ongoing emergency;

(c) the statement was made in order to resolve an emergency or simply to learn what had happened in the past; and

(d) the interview was part of a governmental investigation?; and

"(4) Was the level of formality of the statement sufficient to make it inherently testimonial; *e.g.*, was the statement made in response to questions, was the statement recorded, was the declarant removed from third parties, or was the interview conducted in a formal setting such as in a governmental building?" *Brown*, 285 Kan. at 291.

The irony here is that the only *Brown* factor with much analytical bite in this case is the first, which is the most similar to the one-dimensional definition from *Summers*, 414 F.3d at 1302. In any event, the facts surrounding the making of the unidentified declarant's statement at issue here—"[T]hey [have] the wrong lead"—and the accompanying behavior of laughter and "high-fives" of the persons present persuade us that an objective witness would not reasonably believe that the statement would later be available for use in the prosecution of the crimes. The declarant's statement and the relieved and celebratory laughter and hand slaps were spontaneous expressions among friends watching television. No interview, by law enforcement or otherwise, was taking place; thus no characteristics of an interview are subject to evaluation. The declarant's statement was not testimonial, and admission of Washington's testimony about the statement without Ransom being afforded an earlier opportunity to cross-examine the declarant did not violate Ransom's Sixth Amendment confrontation rights.

Having disposed of Ransom's *Crawford* and *Summers* argument, we move to the hearsay analysis this issue also demands. Ransom argues that Washington's testimony was hearsay that could not qualify for the adoptive admissions exception of K.S.A. 60-460(h)(2). He asserts that the State failed to prove he "manifested by words or other conduct" his adoption of the statement; at most he claims the State proved that Ransom was silent.

In response, the State contends that the district judge did not abuse his discretion in applying K.S.A. 60-460(h)(2). Its fallback position is that any error was harmless, when measured against the damning overload of Ransom's in-custody confession, his additional incriminating statements to or in the presence of Washington, and the corroborating physical evidence.

"Hearsay evidence is not admissible unless it falls within an exception recognized in [K.S.A. 60-460]." *State v. Kesselring*, 279 Kan. 671, 690, 112 P.3d 175 (2005). K.S.A. 60-460(h)(2) provides that an authorized or adoptive admission is admissible despite its categorization as hearsay if the party against whom it is sought to be admitted had knowledge of the content of the statement and has, "by words or other conduct, manifested the party's adoption or belief in its truth."

Ransom asserts that the State proved only that he stood silent while another of the men with whom he had spent the evening spoke in reaction to the news broadcast about the police investigation of the crimes. Assuming his assertion to be accurate, the controlling facts for a K.S.A. 60-460(h)(2) adoptive admissions analysis are nevertheless clear. In such a situation, it is appropriate for this court to review the district judge's decision on admissibility de novo rather than under an abuse of discretion standard. See *State v. Sappington*, 285 Kan. 158, 171, 169 P.3d 1096 (2007) (quoting *State v. Gunby*, 282 Kan. 39, 47, 144 P.3d 647 [2006] [evidentiary rules governing admission, exclusion may be applied as matter of law, in exercise of discretion; when adequacy of legal basis of district judge's decision questioned, review de novo]).

This court has long held that prejudicial statements made in the defendant's presence and tolerated without resentment, explanation, or denial may be admissible as adoptive admissions under

K.S.A. 60-460(h)(2). See *State v. Betts*, 272 Kan. 369, 381-82, 33 P.3d 575 (2001), *overruled on other grounds Davis*, 283 Kan. at 575; see also *State v. Buckner*, 223 Kan. 138, 145, 574 P.2d 918 (1977) (evidence defendant did nothing to refute, deny incriminating statements made by accomplice admissible as adoptive admissions under K.S.A. 60-460[h][2]). In order for silence to meet the statutory standard, the evidence must show:

"(1) [T]he statement was extrajudicial, (2) it was incriminatory or accusative in import, (3) it was one to which an innocent person would in the situation and surrounding circumstances naturally respond, (4) it was uttered in the presence and hearing of the accused, (5) the accused was capable of understanding the incriminatory meaning of the statements, (6) the accused had sufficient knowledge of the facts embraced in the statement to reply thereto, and (7) the accused was at liberty to deny it or to reply thereto." *Betts*, 272 Kan. at 382.

Ransom argues that the second, third, fifth, and sixth factors were not met because the statement Washington repeated was neither incriminatory nor accusatory; an innocent person would not naturally respond to the statement; there was no evidence indicating he understood the incriminatory meaning of the statement; and he did not have sufficient knowledge of the facts to reply.

We disagree. Even if Ransom did not speak, he was not unresponsive. The evidence, including his own confession to police, indicated that Ransom participated in the contemporaneous laughter and round of "high-fives." This participation constituted an unambiguous nonverbal expression of knowledge about the shootings, as well as an understanding of the significance of the news report and any accuracy or inaccuracy of police leads. Under these controlling facts, there was no error in admitting Washington's testimony about the "[T]hey [have] the wrong lead" statement into evidence under the hearsay exception for adoptive admissions of K.S.A. 60-460(h)(2).

### Proximate Cause Jury Instruction

Ransom contends that the PIK Crim. 3d 56.02 instruction given by the district court failed to explain the causation required for felony murder and that the alternate instruction proposed by the defense should have been given instead. Ransom further argues

that this error denied him an opportunity to present his defense and thus his right to a fair trial.

In response, the State contends that our court in *State v. Jackson*, 280 Kan. 541, 124 P.3d 460 (2005), and *State v. Beach*, 275 Kan. 603, 67 P.3d 121 (2003), considered and rejected Ransom's position on PIK Crim. 3d 56.02. Moreover, the State asserts, Ransom's requested instruction misstated the law, and the district judge's approach provided Ransom the opportunity to present his defense.

"When the trial court refuses to give a requested instruction, an appellate court must review the evidence in a light most favorable to the party requesting the instruction. A defendant is entitled to an instruction on his or her theory of the case . . . . [Nevertheless,] [i]f the instructions as a whole properly and fairly state the law as applied to the facts of the case, and the jury could not reasonably be mislead by them, the instructions are not reversible error even if they are in some way erroneous. [Citation omitted.]" *Jackson*, 280 Kan. at 549-50.

In addition, "[t]he use of PIK instructions, while not mandatory, is strongly recommended. The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions." *State v. Anthony*, 282 Kan. 201, 216, 145 P.3d 1 (2006).

The State is correct that we have previously approved of the causation aspect of PIK Crim. 3d 56.02. For example, in *Jackson* we held: " ' "PIK Crim. 3d 56.02 sufficiently incorporates the causation required under the law. The instructions require not only that the death occur during the commission of the felony but that the killing actually be perpetrated by the defendant or another in the commission of the felony." ' " 280 Kan. at 550 (quoting *Beach*, 275 Kan. at 625; *State v. LaMae*, 268 Kan. 544, 555, 998 P.2d 106 [2000]).

The State is also correct that Ransom's requested instruction misstated the law. Our court has long held that agency is not a required element of proof under the felony-murder doctrine. Rather, the State must prove only that the defendant committed a felony inherently dangerous to human life, which directly resulted in the homicide. *State v. Hoffman*, 288 Kan. 100, Syl. ¶ 5, 200 P.3d 1254 (2009). Accordingly, a defendant may be convicted of felony murder even if the victim was not killed by the defendant or an

agent of the defendant, as long as the homicide occurred as a direct result of an inherently dangerous felony. See *State v. Stout*, 37 Kan. App. 2d 510, 519, 154 P.3d 1176, *rev. denied* 284 Kan. 950 (2007) (felony-murder doctrine applies if victim, reasonably defending himself, accidentally kills himself).

Given all of the above, we see no error in the district judge's decision to give the jury PIK Crim. 3d 56.02 rather than Ransom's proposed proximate cause instruction. Moreover,. we observe that, on this issue, Ransom makes no other argument in support of his position that he was denied the opportunity to present his defense and receive a fair trial. In fact, the record on appeal demonstrates that PIK Crim. 3d 56.02 did not prevent Ransom's counsel from arguing lack of causation during closing arguments. Ransom is not entitled to reversal on this basis.

### *Motion for Mistrial*

Ransom next alleges reversible error in the district judge's denial of his motion for a mistrial under K.S.A. 22-3423(1)(b) or (c) because of Bachman's mention of "the gang officers." Ransom argues that our court's standard of review on what he views as a violation of the district judge's limine order must be de novo.

In response, the State asserts that the district judge did not err by denying Ransom's motion for a mistrial because the judge appropriately admonished the jury. The State also asserts that this court reviews rulings on motions for mistrial under an abuse of discretion standard.

K.S.A. 22-3423 provides in pertinent part:

"(1) The trial court may terminate the trial and order a mistrial at any time that [it] finds termination is necessary because:

. . . .

"(b) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law and the defendant requests or consents to the declaration of a mistrial; or

"(c) Prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution."

Our court has long held that an appellate court reviews a district court's decision denying a motion for mistrial under an abuse of discretion standard. See *State v. Albright*, 283 Kan. 418, 425, 153 P.3d 497 (2007). This standard does not change even if legal error prompted consideration of a mistrial. "A court abuses its discretion when no reasonable person would take the same view. [Citation omitted.] A defendant must show substantial prejudice before this court will find the district court abused its discretion in denying a motion for mistrial. [Citations omitted.]" 283 Kan. at 425-26.

There is no dispute that gang evidence was to be excluded at Ransom's trial, but he can demonstrate no substantial prejudice from Bachman's brief reference to "the gang officers." Even if witness preparation and the detective's experience—along with the fact that this detective sat at counsel table during trial and had been present when the admonition was given to other witnesses— should have prevented the reference, it was innocuous. We are confident that it did not create an unduly prejudicial impression that Ransom was involved in a gang or gang activity. Indeed, the district judge's admonition was emphatic in dispelling any weak association that could have arisen in the minds of jurors. As it happened, Ransom may have received a great deal more in the way of a court endorsement because of the detective's mistake than most criminal defendants have a right to expect.

## Motion to Amend Information

Ransom next challenges the district judge's decision to permit the State to amend its information after both parties rested but before jury deliberations began. Again, Ransom asserts this ruling denied his opportunity to present his defense and obtain a fair trial.

The State responds that the amended information did not substantially prejudice Ransom and did not charge Ransom with a new or additional crime.

K.S.A. 22-3201(e) states: "The court may permit a complaint or information to be amended *at any time* before verdict or finding if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced." (Emphasis added.) In other words, we, like the district court, must ask two questions to

determine whether a complaint or information can be amended: (1) Did the amendment charge an additional or different crime? and (2) Were the substantial rights of the defendant prejudiced by the amendment? See *State v. Matson*, 260 Kan. 366, 370, 921 P.2d 790 (1996).

Here, the prosecution amended Count 3 of the information to cover the possibility that the felony murder of Spain Bey occurred during Ransom's flight from, rather than only his commission of, the attempt to commit aggravated robbery. The amended language did not charge an additional or different crime; felony murder was still the only crime charged in that count, and it can be committed if a death results from a defendant's flight from an inherently dangerous felony such as attempted aggravated robbery. See K.S.A. 21-3401(b). Moreover, Ransom's substantial rights were not prejudiced because he and his counsel had always been aware that evidence of Ransom's flight from an inherently dangerous felony was part of the State's case, regardless of whether Ransom's or the State's version of the North Lorraine homicide was accepted by the jury. This issue has no merit.

*Sufficiency of Evidence on Felony Murder Charged in Count 3*

Finally, Ransom argues that there was insufficient evidence to convict him of the felony murder of Spain Bey charged in Count 3 because the State failed to prove Spain Bey died during the commission of an attempted aggravated robbery.

" 'When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. [Citation omitted.]' " *Hoffman*, 288 Kan. at 106-07.

A conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Garcia*, 285 Kan. 1, 22, 169 P.3d 1069 (2007).

As noted above, to support a felony-murder conviction, this court requires proof that a defendant committed a felony inherently dangerous to human life that directly resulted in a homicide. *Hoffman*, 288 Kan. at 107. A defendant may be convicted of felony

murder even if the victim was not killed by the defendant or an agent of the defendant, as long as the homicide occurred as a direct result of an inherently dangerous felony. *Stout*, 37 Kan. App. 2d at 519.

Bachman testified that Spain Bey was alive in the North Lorraine house before the second attempted aggravated robbery. Ransom, with his two accomplices, then attempted to rob the house, heard gun shots, and ran away. Officers discovered Spain Bey dead when the smoke cleared. Regardless of which version of events the jury accepted, this was sufficient circumstantial evidence to support Ransom's conviction for the felony murder of Spain Bey as a result of Ransom's commission of or flight from the second attempted aggravated robbery. The State did not have to prove that Ransom or one of his accomplices fired the shots that killed Spain Bey.

Affirmed.

MCFARLAND, C.J., not participating.

STANDRIDGE, J., assigned.