NOT DESIGNATED FOR PUBLICATION

No. 112,411

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

EVERETTE R. REDBURN, SR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Lane District Court; BRUCE T. GATTERMAN, judge. Opinion filed February 26, 2016. Affirmed and remanded with directions.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Douglas W. McNett*, of Larned, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., PIERRON, J., and WALKER, S.J.

*Per Curiam*:  Everette R. Redburn, Sr., appeals his convictions of aggravated assault and criminal threat. He argues: (1) The district court erred in failing to give a unanimity instruction, (2) the district court abused its discretion by allowing the State to amend its complaint during the trial, and (3) the journal entry of sentencing did not accurately represent what was announced at sentencing. Finding no error in the first two issues, we affirm the convictions but remand for correction of the journal entry of sentencing.

FACTS

Redburn had a very strained relationship with his son, Everette Redburn, Jr. (E.R.). It began when E.R. was a child and chose to live with his grandparents while Redburn was in the service. More recently, Redburn was upset by E.R.'s involvement in a legal case that resulted in Redburn's other son losing custody of his children. At some point, Redburn asked E.R. either to give him $50,000 or to cosign a $50,000 loan but E.R. did not do so. E.R.'s wife even threatened to call the police when Redburn came over one day.

On July 12, 2013, around 3:30 p.m., Redburn called the Lane County Sheriff's Office to report allegations of sexual misconduct against E.R. involving Redburn's niece which took place 20 to 25 years ago in Scott County. Deputy Brian Kough responded and told Redburn to have the victim report the incident in Scott County. Redburn was dissatisfied with that response and reportedly told Kough that he would take matters into his own hands. Kough cautioned him that it could lead to him being charged with a crime. Redburn later denied making the statement.

Around 6 p.m., E.R., his daughter and son-in-law, Jessica and Derek Reinerio, and his 18-month-old grandson were at E.R.'s house, about to head to the fair. Derek had gone out earlier to put the car seat in place and was waiting for the others in the driver's seat. E.R., Jessica, and his grandson were heading to Jessica's car when Redburn arrived and parked his car behind hers.

According to E.R., Redburn got out of his car and began saying that E.R. was a "lying son of a bitch" and greedy. The testimony is not clear from the record, but either E.R. or Jessica asked Redburn why he was there. They both testified that Redburn answered that he was there to kill E.R. Jessica then pounded on her car and told her husband to get out of the car.

2

Jessica testified that she approached Redburn while holding her son and told him to leave; Redburn said that nobody cared about her. She replied that nobody cared about him either. Redburn then allegedly took out a 10-inch kitchen knife and pointed it at Jessica. According to E.R. and Derek, Jessica was standing about a 1 1/2- to 2-feet away from Redburn. Jessica then fled with her son behind the house, returning only to get her cell phone from the car to call the police. Jessica later testified that she was very scared at the time.

According to E.R., he and Redburn were talking when Redburn dropped the knife. E.R. kicked or tossed the knife over to Derek, who put it on the car hood near the windshield wipers. E.R. said he told Redburn that the cops were coming and offered Redburn a ride home. According to E.R., Redburn then hit him on his right ear. As the police arrived, Redburn allegedly said that once he got out of jail, he would get a gun and come back and kill everyone.

Sheriff Steven Edler was the first to arrive and spoke with E.R., Derek, and Jessica. Edler noted that E.R. and Redburn were standing side-by-side and not fighting or arguing when he arrived. Deputy Kough then arrived and took Redburn aside and spoke to him. Kough testified that that while patting Redburn down, Redburn "told me he had intentions with that knife to kill Everette, Jr." Kough believed that Redburn was intoxicated because he stumbled, had slurred speech, was slow in reacting, and smelled like alcohol. Kough then arrested Redburn based on his statement that he intended to kill E.R. He also testified that Redburn said he regretted what he had done while in the police car.

Redburn testified to his version of the events. He said that after speaking with police about the sexual abuse allegations, he kept thinking about it while he prepared dinner for his wife and decided to go speak to his son. According to Redburn, as soon as he got to E.R.'s house, Jessica said she was calling the police while Redburn went over to

3

confront his son about the allegations. Redburn testified that E.R. then shoved him against the car and that is when he realized he had absentmindedly put the kitchen knife in his back pocket, blade facing up. He then took the knife out of his pocket to throw it aside when he was tackled by E.R. and Derek. Redburn said he and E.R. then began talking until police arrived. Redburn denied ever threatening Jessica, Derek, or E.R. He also denied being drunk or making any statements to police about wanting to kill E.R.

Redburn was charged with aggravated assault, criminal threat, and battery. A jury trial was held on April 29-30, 2014. The jury convicted Redburn of aggravated assault and criminal threat.

In June 2014, the district court sentenced Redburn to 12 months in prison for the aggravated assault conviction and 6 months for the criminal threat conviction to run consecutively, resulting in a total underlying sentence of 18 months. The court then suspended the sentences and imposed 24 months' probation for the aggravated assault conviction to run concurrent with a 12 months' probation for the criminal threat conviction. The journal entry of judgment provided that the underlying prison sentence was 24 months.

Redburn now appeals to this court.

ANALYSIS

Redburn first argues that his criminal threat conviction should be reversed because the State presented evidence of two acts that each could have constituted the crime of criminal threat and did not elect a single act upon which to proceed nor did the district court give a unanimity instruction. He suggests that the jury could have relied on two separate acts in convicting him of criminal threat: (1) the threat to kill E.R. when he first

4

arrived at E.R.'s house or (2) the threat to come back with a gun and kill everyone while police were arriving.

In Kansas, criminal defendants have a right to a unanimous jury verdict. See K.S.A. 22-3421; K.S.A. 22-3423(1)(d); *State v. Santos-Vega*, 299 Kan. 11, 18, 321 P.3d 1 (2014). When the State has alleged the defendant committed multiple acts and any one of them could constitute the crime charged, there is the potential for uncertainty as to whether the jury unanimously agreed on a particular act that constituted the crime charged. *State v. De La Torre*, 300 Kan. 591, 595, 331 P.3d 815, *cert. denied* 135 S. Ct. 728 (2014). To ensure jury unanimity in these cases (known as multiple acts cases), the district court must instruct the jury that it must unanimously agree on the specific act constituting the charged crime or the State must adequately elect which act it is relying upon for conviction; failure to do so is error. *State v. Akins*, 298 Kan. 592, 618, 315 P.3d 868 (2014); *State v. Voyles*, 284 Kan. 239, Syl. ¶ 2, 160 P.3d 794 (2007); *State v. Crossett*, 50 Kan. App. 2d 788, 793, 332 P.3d 840 (2014), *rev. denied* 302 Kan. __ (August 20, 2015).

The district court raised the issue of multiple acts at the close of the State's evidence at trial, noting the two statements. The State replied that it was electing to prosecute based on the second statement that Redburn would come back with a gun and kill everyone. The district court judge stated that "with the understanding that the election is going to be made to the jury that that's what the State is relying on, I don't think there's a need for that multiple acts instruction on criminal threat."

In analyzing multiple acts cases, this court follows a three-part test. *State v. King*, 297 Kan. 955, 978-84, 305 P.3d 641 (2013). First, this court must determine whether the case even involves multiple acts. *De La Torre*, 300 Kan. at 596. This a question of law over which the appellate court exercises unlimited review. *Santos-Vega*, 299 Kan. at 18. If the court decides multiple acts were involved, the next question is whether error was

5

committed because either the district court failed to instruct the jury to agree on the specific act for each charge or the State failed to inform the jury which act to rely upon during its deliberations. Finally, if error was committed, this court must determine whether the error was harmless. 299 Kan. at 18.

The first step is determining whether the case involves multiple acts. Four factors are relevant in analyzing whether a defendant's conduct was one act or multiple, separate acts: "'(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct.'" *King*, 297 Kan. at 981 (quoting *State v. Schoonover*, 281 Kan. 453, 507, 133 P.3d 48 [2006]). The parties agree that there were two separate, distinct acts. Given that the threats were made at different times, directed at different people, and motivated by different events, this case clearly involves multiple acts.

Because multiple acts were involved and the district court did not give a unanimity instruction, error occurred unless the State elected, either explicitly or functionally, the particular criminal act upon which it relied. See *King*, 297 Kan. at 983. Kansas courts have generally held that the State can functionally elect a particular act by focusing its opening statement and closing arguments on the act upon which the jury is to rely on to convict the defendant. *State v. Moyer*, 302 Kan. 892, Syl. ¶ 7, 360 P.3d 384 (2015); *State v. Dickson*, 275 Kan. 683, 696-97, 69 P.3d 549 (2003); *State v. Fulton*, 28 Kan. App. 2d 815, 821-22, 23 P.3d 167, *rev. denied* 271 Kan. 1039 (2001). But in *State v. Colston*, 290 Kan. 952, 969, 235 P.3d 1234 (2010), the Kansas Supreme Court said that merely focusing arguments is not a sufficient election because "this is not the same as informing the jury that it could not consider evidence of other acts supporting the same charge or that it must agree on the same underlying criminal act." Nevertheless, in *Moyer*, the court's latest consideration of the issue, it held that the State made a functional election for most of the charges by focusing its closing arguments on a specific sexual act on a

6

specified day for each charge, observing there was "no room for jury confusion." 302 Kan. at 911-12. For one of the counts, however, the court found the jury may have been uncertain about which act it was to rely on. In its closing arguments, the State told the jury that the criminal sodomy charge was supported by evidence that the victim had performed oral sex on the defendant on a particular day but the victim had testified that she had performed two acts of fellatio that day. As such, the court could not be sure that the jury was unanimous but it ultimately found the State's ineffective election was harmless and did not impact the outcome. 302 Kan. at 912-13.

Redburn cites portions of the State's closing arguments that refer to the first statement to suggest that the State did not elect an act. He also argues that the State's functional election should provide the same level of information as the unanimity instructions, particularly that the State inform the jury that it must agree on the underlying act. The State counters that Redburn cited many portions out of context and that its closing argument sufficiently constituted an election, negating the need for a unanimity instruction.

To resolve this dispute, this court must first review the State's opening statement and closing arguments. See *Moyer*, 302 Kan. at 911. The State's opening statement does not specify which of the two statements the State is relying on to support the criminal threat charge, noting only that the facts of the case support the charge. Its closing arguments detailed the evidence and testimony that the jury should rely on to support each element of each charge, like a checklist. The closing arguments reference Redburn's first statement that he was there to kill E.R. but in support of the aggravated assault charge:

> "Yesterday the evidence came in that showed that when [Redburn] got there he briefly argues, he trades insults with his [granddaughter]. He also made a threat that he was going to kill her father. And he pulls out a knife, letting her know that he has the

7

means to do that. That is . . . significant right there when as she said, it was—she was half way between the court reporter and where she was sitting. That's how close [she] and [her son] were.

"Now, picture this for a moment . . . . [Jessica's] got [her son] on her right hip. She's got grandpa right here. Grandpa is drunk, giving threats out as to what he's going to do, that he's going to kill someone, and then he brings out a knife.

. . . .

"Now, we'll move on to the elements of the crime. The State has charged [Redburn] with aggravated assault for what I was just describing. That—and here's your checklist. . . .

"That [Redburn] knowingly placed a person in reasonable apprehension of immediate bodily harm.

"So, when Jessica was confronted with a drunk grandpa wielding a knife and making threats, she was in reasonable apprehension of bodily harm."

In regards to the criminal threat charge, the State said the following:

"Now, the next crime . . . [f]or which [Redburn] is charged [is] criminal threat. We have to show that [Redburn] threatened to commit violence and communicated the threat with the intent to place another in fear.

"Well, when the deputies start arriving . . . , there was the statement that came out yesterday, that they are arresting me now, but I will get a gun and come back and kill you.

"Let's think about that for a minute. Of what is being said after everything else has happened. He had already come to the farm, armed with a knife, and according to one of our law enforcement officers he was drunk. And through the course of that information, somehow the knife got on the ground, and he wasn't successful in concluding his goal.

"Doesn't it make sense to you that anyone standing there would believe he's coming back with a gun when he has a chance to finish what he started? That's what he's telling everybody. That's what he's saying to his family. So you can check that one off."

8

Redburn also notes the State's reference to Kough's sworn testimony that Redburn said he came out there to kill E.R. to suggest that the State did not make an election. The State did not refer to Kough's statement to support any particular charge but rather to diminish Redburn's credibility after Redburn's closing arguments, noting that "[Kough's statement] completely contradicts what [Redburn] just told you on the stand." The State argued to the jury that Kough was the "objective person in this whole set of facts, that's showing you which of these two views of what happened out there is true."

By directing the jury to rely on the second statement to support the criminal threat charge in its closing arguments, the State was clearly attempting to make an election or its functional equivalent. Although the State did not inform the jury that it could not consider the other threat or that it must unanimously agree on the act, such information is not required if there is little risk of jury confusion. See *Moyer*, 302 Kan. at 911-12. It is unlikely here that the jury was confused about which statement the State was prosecuting as criminal threat. We find that the State adequately elected to prosecute Redburn for criminal threat based on the second statement and so no error occurred.

Based upon our finding of no error, it is unnecessary for us to perform the rest of the analysis. But even if we were to find error in the district court's failure to give a unanimity instruction, we note that Redburn did not request such a jury instruction at trial.

Under K.S.A. 2015 Supp. 22-3414(3), if a party fails to request an instruction or to object to the failure to give a jury instruction at trial, this court evaluates whether the failure to give an instruction was clearly erroneous. *State v. Williams*, 295 Kan. 506, 511-13, 286 P.3d 195 (2012). Under the clear error test, the reviewing court will only reverse when it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. *State v. Sisson*, 302 Kan. 123, 129, 351 P.3d 1235 (2015) (citing *Williams*, 295 Kan. 506, Syl. ¶¶ 4-5); *State v. Trujillo*, 296 Kan. 625, 631, 294

9

P.3d 281 (2013) (adopting *Williams* language and framework in evaluating whether failure to give a unanimity instruction was clear error).

Redburn contends that because the court raised and addressed the multiple acts issue on its own, this court should apply the harmless error standard set out in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). Under the harmless error standard, an error is harmless only if the error did not affect the trial's outcome. 292 Kan. at 565. If the error implicates a constitutional right, before a Kansas court can declare the error harmless it must be persuaded beyond a reasonable doubt that there was no impact on the trial's outcome; but if the error implicates a statutory right, the court must only be persuaded that there is no reasonable probability that the error impacted the outcome. 292 Kan. at 565. Generally, the harmless error standard only applies when the complaining party raised the jury instruction issue at the trial court. See, *e.g.*, *Moyer*, 302 Kan. at 908-09; *State v. Plummer*, 295 Kan. 156, 161-63, 283 P.3d 202 (2012). Redburn cites no authority that the court raising the multiple acts issue itself entitles him to the harmless error standard but notes that the matter was "fully considered and ruled upon by the district court." Yet, he could have objected and requested the court to give a unanimity instruction after the State's closing arguments if he felt that the State failed to make an election as it had promised. For that reason, in essence Redburn failed to object at the trial court, and the clear error standard should apply in this case.

Applying the clear error test, we would need to determine if we would be firmly convinced that the jury would have reached a different outcome if the instruction had been given. In *Voyles*, the Kansas Supreme Court held that failure to give a unanimity instruction in a multiple acts case is reversible error except when the defendant has presented a unified defense by generally denying the allegations. 284 Kan. at 253. More recently, the court clarified that even if a defendant presents a unified defense, the failure to instruct may still constitute reversible error but noted that a defendant's defense strategy remains an "important and compelling factor" to consider. *Trujillo*, 296 Kan. at

10

631. The reviewing court also considers whether inconsistencies in a victim's testimony could lead to jury confusion and lack of unanimity even if the defendant generally denies wrongdoing. See *King*, 297 Kan. at 983; *State v. Foster*, 290 Kan. 696, 716, 233 P.3d 265 (2010).

In this case, Redburn presented a unified defense because he completely denied threatening anyone. E.R., Derek, and Jessica all testified consistently at trial about the events, and their testimony echoed what they said at the preliminary hearing and what they told police on the scene. We are not firmly convinced that the jury would have reached a different outcome if the instruction had been given. If the State's election was ineffective, any error was harmless.

In his second issue on appeal, Redburn argues that the district court should not have allowed the State to amend the charge for aggravated assault to name a specific victim during the trial because it prejudiced his substantial rights. The State contends that the district court did not abuse its discretion in allowing the amendment because the amendment did not prejudice Redburn's substantial rights.

Under K.S.A. 22-3201(e), "[t]he court may permit a complaint or information to be amended at any time before verdict or finding if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced." In determining whether a complaint or information can be amended, this court, like the district court, must ask itself: (1) Did the amendment charge an additional or different crime? and (2) Were the substantial rights of the defendant prejudiced by the amendment? *State v. Ransom*, 288 Kan. 697, 715-16, 207 P.3d 208 (2009).

Whether the amendment allowed by the district court violated K.S.A. 22-3201(e) is reviewed for an abuse of discretion. *State v. Holman*, 295 Kan. 116, 145, 284 P.3d 251 (2012) (citing *State v. Bischoff*, 281 Kan. 195, 205, 131 P.3d 531 [2006]). A court abuses

11

its discretion when no reasonable person would agree with its decision or its decision is based on an error of law or fact. *State v. Pfannenstiel*, 302 Kan. 747, 760, 357 P.3d 877 (2015); *Holman*, 295 Kan. at 145. The defendant has the burden to establish that the district court abused its discretion in allowing the State to amend the complaint. *Biscoff*, 281 Kan. at 205.

At the close of the State's evidence, the judge, prosecutor, and defense attorney held the preliminary instruction conference. The State announced its intention to request that the court allow it to amend the aggravated assault charge in the complaint because it did not name a specific victim. The complaint for Count 1 aggravated assault originally charged: "That on or about 7/12/2013, the above named defendant, . . . [did] . . . unlawfully and knowingly plac[e] another person in reasonable apprehension of immediate bodily harm with a deadly weapon, to-wit: A 10 INCH KITCHEN KNIFE."

Redburn's attorney objected and moved for a directed verdict for the aggravated assault charge for failure to name a specific person. The parties agreed to take up the matter the next day. The following morning, the State sought to amend the charge to name Jessica as the victim of the aggravated assault. The defense attorney again objected and requested dismissal of the charge.

In ruling on the motion to amend the charge, the district court noted that under K.S.A. 22-3201(e), it can permit amendment to the complaint at any time before the verdict so long as there is no additional or different crime charged and the substantial rights of the defendant are not prejudiced. The district court determined that naming and identifying a specific victim is not an additional or different crime. The court additionally noted that "[t]he testimony at [the] preliminary hearing largely mirrored that that was presented yesterday as to the [State's] case in chief" and found that amending the name "[would] not prejudice the substantial rights of Mr. Redburn, Sr." Accordingly, the court granted the motion.

12

On appeal, Redburn and the State agree that the amendment did not result in additional or different crimes being charged but disagree whether the amendment prejudiced Redburn's substantial rights. In particular, Redburn argues that his rights were prejudiced because the evidence presented at the preliminary hearing and trial "would have naturally led Mr. Redburn and defense counsel to believe that the victim of the alleged aggravated assault was E.R." and the amendment "completely thwarted" his efforts to prepare a defense. The State counters that Redburn's substantial rights were not prejudiced. According to the State, because Redburn's defense from the outset of trial was that he brought the knife to the confrontation by pure accident, "from the defense['s] perspective it wouldn't have matter[ed] who the specific named victim was."

Kansas courts have long considered whether the amendment to the charging document could have unfairly surprised the defendant in evaluating whether the amendment prejudiced the defendant's substantial rights. See, *e.g.*, *Holman*, 295 Kan. at 146; *State v. Barncord*, 240 Kan. 35, 38, 726 P.2d 1322 (1986); *State v. Calderon-Aparicio*, 44 Kan. App. 2d 830, 849, 242 P.3d 1197 (2010) (noting defendant conceded he was not surprised by amendment), *rev. denied* 291 Kan. 913 (2011). Kansas courts have frequently looked at pretrial statements and testimony at preliminary hearings in considering whether the defendant could have been surprised. See *Holman*, 295 Kan. at 146; *Bischoff*, 281 Kan. at 195; *Barncord*, 240 Kan. at 38.

In finding the amendment was not prejudicial, the district court noted that the testimony at the preliminary hearing largely mirrored evidence and testimony presented at trial. During the preliminary hearing, both Jessica and Derek testified that Redburn pulled out a knife within 18 to 24 inches of Jessica and her son and pointed it at her while saying he was there to kill E.R. At the close of the preliminary hearing, the State argued that the evidence showed that Redburn "knowingly placed all three of the individuals that would be E.R., Jessica and Der[ek] in reasonable apprehension of immediate bodily

13

harm." It is difficult to imagine how Redburn could have been unfairly surprised when the State sought to name Jessica as the victim at trial.

Kansas courts also consider whether the amendment impacted the defendant's ability to prepare and present a defense. This court has found an amendment to a complaint or information does not interfere with the defendant's ability to defend against the charge when the defendant can keep the same defense under the amendment. See *Calderon-Aparicio*, 44 Kan. App. 2d at 849 (noting defendant's failure to detail how his defense would have changed in light of amendments 3 days before trial); *State v. Ibrahim*, No. 106,953, 2013 WL 195516, at *10 (Kan. App. 2013) (unpublished opinion) (finding no prejudice when defendant failed to show his defense would have changed); but see *State v. Spangler*, 38 Kan. App. 2d 817, 826-29, 173 P.3d 656 (2007) (amendment substantially prejudiced defendant's denial defense applied to either alternative theories of underlying felony charges because amendment expanded time period and changed specific overt acts of the alleged crimes).

In this case, after the district court allowed the amendment, Redburn testified in his own defense and generally denied all the allegations, contending that he had the knife with him by accident, consistent with the defense counsel's opening statement. In particular, Redburn denied ever threatening Jessica, Derek, or E.R. and stated that the only time the knife was displayed was when he was attempting to toss it away after he realized he had inadvertently placed it in his back pocket before he drove over to E.R.'s house. Although Redburn contends his defense was "completely thwarted" by the amendment naming Jessica as the victim, his defense was not victim-specific—it was a general denial and he has not explained how his defense would have changed.

Because a reasonable person could find that Redburn's substantial rights were not prejudiced by the amendment, Redburn has failed to establish that the district court abused its discretion in allowing the amendment.

Finally, Redburn contends that the journal entry of judgment's underlying sentence is inconsistent with the sentence imposed at the hearing and must be corrected by the district court. The State concedes this error.

At sentencing, the district court sentenced Redburn to a 12-month sentence on the aggravated assault conviction and a 6-month sentence on the criminal threat conviction to run consecutively, resulting in a total underlying sentence of 18 months. The court then suspended the sentences and imposed a 24-month probation term for the aggravated assault conviction to run concurrent with a 12-month probation term for the criminal threat conviction. But the journal entry of judgment incorrectly lists Redburn's underlying prison term as 24 months.

A criminal sentence is effective when pronounced from the bench at the sentencing hearing; it does not derive its effectiveness from the journal entry. Therefore, a journal entry that imposes a sentence that varies from sentence pronounced from the bench is erroneous and must be corrected to reflect the actual sentence imposed. *State v. Mason*, 294 Kan. 675, 677, 279 P.3d 707 (2012) (quoting *Abasolo v. State*, 284 Kan. 299, Syl. ¶ 3, 160 P.3d 471 [2007]). The journal entry of sentencing can be corrected by a nunc pro tunc order. See K.S.A. 22-3504(2); *Mason*, 294 Kan. at 677.

Therefore, we affirm Redburn's convictions but remand with directions to file a nunc pro tunc journal entry that accurately reflects the 18-month sentence actually imposed on him.

Affirmed and remanded with directions.

\* \* \*

MALONE, C.J., concurring:  I disagree that the prosecutor properly elected which act supported the charge of criminal threat, but because the error was harmless, I agree that Everette R. Redburn, Sr.'s conviction on this count should be affirmed. In *State v. Colston*, 290 Kan. 952. Syl. ¶ 5, 235 P.3d 1234 (2010), the Kansas Supreme Court stated:

> "In a multiple acts case, the State fails to properly elect the act it is relying upon by arguing merely that only one act supports the charge. The State's argument that only one act supports the charge is not the same as informing the jury that it cannot consider evidence of other acts supporting the same charge or that it must agree on the same underlying criminal act."

If this statement from *Colston* is still the law in Kansas, then the prosecutor in this case did not properly elect which of two separate acts supported the criminal threat charge. The jury heard evidence that Redburn threatened to kill E.R. when he first arrived at E.R.'s house. The jury also heard evidence that while the police were arriving at the scene, Redburn threatened that once he got out of jail, he would get a gun and come back and kill everyone. During closing argument, the prosecutor focused on the second act to support the criminal threat charge. The prosecutor also mentioned the first act during the closing argument, but he did not refer to the first act to support any particular charge. The prosecutor never informed the jury that it could not consider the first act to support the criminal threat charge or that the jury must agree on the same underlying act.

In *State v. Moyer*, 302 Kan. 892, 360 P.3d 384 (2015), the Kansas Supreme Court recently addressed the propriety of an election by the State in a multiple acts case. The *Moyer* court found that the prosecutor in that case involving multiple sexual acts had made the functional equivalent of an election by the State because the prosecutor focused the jurors' attention during closing argument on specific sexual acts to support each charge. 302 Kan. at 911-12. However, the prosecutor in *Moyer* never informed the jury that it could not consider evidence of other acts supporting the same charge or that it must agree on the same underlying criminal act. In discussing whether the State had made a

16

proper election, the *Moyer* court cited the *Colston* decision for the proposition that in order to make a proper election in a multiple acts case, the prosecutor must tell the jury it cannot consider evidence of other acts supporting the same charge or that it must agree on the same underlying criminal act. *Moyer*, 302 Kan. at 911-12. Nevertheless, the *Moyer* court breezed by the holding in *Colston* and found that the prosecutor's election in that case was sufficient, at least as to most of the charges, because the court could "discern no room for jury confusion as to the particular sexual act for which the State was prosecuting Moyer." 302 Kan. at 912.

The ruling in *Moyer* is inconsistent with the holding in *Colston*. The *Moyer* court did not overrule the decision in *Colston*, it simply ignored it, creating uncertainty in the law in Kansas as to what constitutes a proper election by the State in a multiple acts case.

Here, the district court instructed the jury that in order to establish the charge of criminal threat, the State must prove that Redburn "threatened to commit violence and communicated the threat with the intent to place another in fear." At trial, the jury heard evidence that Redburn threatened to kill E.R. when he first arrived at E.R.'s house. The jury also heard evidence that Redburn threatened to come back and kill everyone after he got out of jail. Although the prosecutor focused on the second act during the closing argument, the prosecutor never told the jury that it could not consider the first act to convict Redburn of criminal threat. Moreover, the prosecutor mentioned both threats during the closing argument. Under these circumstances, I would find that the prosecutor failed to properly elect which act supported the criminal threat charge. Thus, the State committed a multiple acts error as to the charge of criminal threat.

Nevertheless, I agree with the majority that any error was harmless. Redburn failed to request a multiple acts jury instruction at trial, so we analyze the issue for clear error. See K.S.A. 2015 Supp. 22-3414(3). Here, Redburn presented a unified defense because he completely denied threatening anyone. At trial, E.R. and other witnesses all

17

testified consistently about the events, and their testimony echoed what they said at the preliminary hearing and what they told police on the scene. I am not firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. See *State v. Sisson*, 302 Kan. 123, 129, 351 P.3d 1235 (2015). Moreover, I would find the error harmless even if we applied the harmless error standard set out in *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).